No. 12-31155
(consolidated with No. 13-30095)

———————————

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

———————————

In Re: Deepwater Horizon – Appeals of the Economic and Property
Damage Class Action Settlement

———————————

Lake Eugenie Land & Development, Incorporated; Bon Secour
Fisheries, Incorporated; Fort Morgan Realty, Incorporated; Lfbp
1, L.L.C. doing business as GW Fins; Panama City Beach Dolphin
Tours & More, L.L.C.; Zekes Charter Fleet, L.L.C.; William Sellers;
Kathleen Irwin; Ronald Lundy; Corliss Gallo; John Tesvich;
Michael Guidry, On Behalf Of Themselves And All Others
Similarly Situated; Henry Hutto; Brad Friloux; Jerry J. Kee,

*Plaintiffs–Appellees,*

*v.*

BP Exploration & Production Incorporated,
BP America Production Company, and BP P.L.C.,

*Defendants–Appellees,*

*v.*

Gulf Organized Fisheries in Solidarity & Hope, Incorporated,

*Movant–Appellant.*

———————————

On Appeal from the United States District Court
for the Eastern District of Louisiana
MDL No. 2179, Civ. A. No. 12-970

———————————

# RECORD EXCERPTS FOR APPELLEES BP EXPLORATION &
# PRODUCTION INC., BP AMERICA PRODUCTION CO.,
# AND BP P.L.C.

———————————

*[counsel listed on inside cover]*

Richard C. Godfrey, P.C.
J. Andrew Langan, P.C.
Wendy L. Bloom
Andrew B. Bloomer, P.C.
R. Chris Heck
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL  60654
(312) 862-2000

Jeffrey Bossert Clark
Steven A. Myers
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C.  20005
(202) 879-5000

S. Gene Fendler
Don K. Haycraft
R. Keith Jarrett
LISKOW & LEWIS
701 Poydras Street
Suite 5000
New Orleans, LA  70139
(504) 581-7979

Theodore B. Olson
  *Counsel of Record*
Miguel A. Estrada
Thomas G. Hungar
Scott P. Martin
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500

George H. Brown
GIBSON, DUNN & CRUTCHER LLP
1881 Page Mill Road
Palo Alto, CA  94304
(650) 849-5300

Daniel A. Cantor
Andrew T. Karron
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, D.C.  20004
(202) 942-5000

Jeffrey Lennard
DENTONS LLP
233 South Wacker Drive
Suite 7800
Chicago, IL  60606
(312) 876-8000

*Counsel for Defendants-Appellees*

# TABLE OF CONTENTS

1. Excerpts of Settlement Agreement (from Order Approving Settlement Agreement), D.E. 6430-1 (USCA5 6268, 6474-76, 6479-80) (May 3, 2012) ...........................................................R.E.1

2. BEL Policy Decision Cover E-Mail, D.E. 8964-21 (USCA5 25159) (Jan. 15, 2013)........................R.E.7

3. Claims Administrator's BEL Policy Decision, D.E. 8964-22 (USCA5 25162-63) (Jan. 15, 2013) ..................R.E.8

4. March 5, 2013 Order on Variable Profit, D.E. 8812 (USCA5 20999-1004) (Mar. 5, 2013)....................R.E.10

5. Advertisements of Plaintiffs' Lawyers, D.E. 8964-25 (USCA5 25208-10) (Mar. 20, 2013)................R.E.16

6. Excerpts of Declaration of J. Lester Alexander, III, D.E. 8964-4 (USCA5 24581-82, 24595) (Mar. 20, 2013).......R.E.19

7. Excerpts of Declaration of A. Mitchell Polinsky, D.E. 8964-15 (USCA5 24933-35) (Mar. 20, 2013)................R.E.22

8. Excerpts of Declaration of Hal Sider, D.E. 8964-17 (USCA5 24965-66, 24973-77) (Mar. 20, 2013) ....................................................R.E.25

9. Excerpts of Supplemental Declaration of Hal Sider, D.E. 8964-18 (USCA5 25048-49, 25053) (Mar. 20, 2013) ....................................................R.E.32

10. Excerpts of Declaration of Roman L. Weil, D.E. 8964-19 (USCA5 25145-50) (Mar. 20, 2013)................R.E.35

**1.   Excerpts of Settlement Agreement (from Order Approving Settlement Agreement)**

April 16, 2012; or

1.2.4.    owned or leased **REAL PROPERTY** in the Gulf Coast Areas at any time from April 20, 2010 to April 16, 2012;

1.3.    Individuals and Entities who meet the geographical descriptions of Sections 1.1 or 1.2 above are included in the Economic Class only if their Claims meet the descriptions of one or more of the Damage Categories described below.

1.3.1.    The following are summaries of the Damage Categories, which are fully described in the attached Exhibits 1A-15:

1.3.1.1.    **SEAFOOD COMPENSATION PROGRAM.** Damages suffered by a **COMMERCIAL FISHERMAN,** Seafood Crew, or **SEAFOOD VESSEL OWNER** that owned, operated, leased or worked on a vessel that (1) was Home Ported in the Gulf Coast Areas at any time from April 20, 2010 to April 16, 2012, or (2) Landed Seafood in the Gulf Coast Areas at any time from April 20, 2009 to April 16, 2012; and damages suffered by, *inter alia,* **OYSTER LEASEHOLDERS** and IFQ Owners. (*Exhibit 10*). Claims for Economic Damage arising from the fishing, processing, selling, catching, or harvesting of menhaden (or "pogy") fish are excluded from the Seafood Compensation Program and other Economic Damage Claims under this Agreement.

1.3.1.2.    Economic Damage Category. Loss of income, earnings or profits suffered by Natural Persons or Entities as a result of the **DEEPWATER HORIZON INCIDENT**, subject to certain Exclusions. (Exhibits 16-19)

1.3.1.3.    Subsistence Damage Category. Damages suffered by Natural Persons who fish or hunt to harvest, catch, barter, consume or trade Gulf of Mexico natural resources, including Seafood and **GAME**, in a traditional or customary manner, to sustain their basic or family dietary, economic security, shelter, tool or clothing needs, and who relied upon Subsistence resources that were diminished or restricted in the geographic region used

**R.E.1**

**Compensation Framework for Business Economic Loss Claims**

The compensation framework for business claimants compares the actual profit of a business during a defined post-spill period in 2010 to the profit that the claimant might have expected to earn in the comparable post-spill period of 2010.[1] The calculation is divided into two steps:

> **Step 1** – Compensates claimants for any reduction in profit between the 2010 Compensation Period selected by the claimant and the comparable months of the Benchmark Period. Step 1 compensation reflects the reduction in Variable Profit (which reflects the claimant's revenue less its variable costs) over this period.

> **Step 2** – Compensates claimants for incremental profits or losses the claimant might have been expected to generate in the absence of the spill relative to sales from the Benchmark Period. This calculation reflects a Claimant-Specific Factor that captures growth or decline in the pre-spill months of 2010 compared to the comparable months of the Benchmark Period and a General Adjustment Factor.

For purposes of the two step calculation, the parties have agreed to a defined list of fixed and variable expenses as reflected in Attachment A.

In order to allocate payroll expenses (including Salaries and Wages, Employee Benefits, and, where applicable, 401K Payments, but excluding Owner/Officer Compensation) into fixed and variable components, a minimum level of fixed payroll costs will be measured based on the average of the two months between May 2010 and December 2010 in which the claimant had its lowest payroll costs. Certain exceptions are identified below for identifying months with the claimant's lowest payroll costs.

For claimants that include Cost of Goods Sold (COGS) in their financial statements, COGS will be treated as a variable expense after excluding, to the extent possible, the following cost items which may be embedded in COGS and are likely to be fixed in nature: Fixed COGS Payroll, Amortization, Depreciation, Insurance Expense, Interest Expense, and Contract Services.

Based on these considerations, the resulting calculations are performed to determine compensation for claimants.

I.    **Definitions**

For the purposes of this calculation, the following are defined terms:

**Compensation Period:**  The Compensation Period is selected by the Claimant to include three or more consecutive months between May and December 2010.

**Benchmark Period:** The Benchmark Period is the pre-DWH Spill time period which claimant chooses as the baseline for measuring its historical financial performance.  The claimant can select among the

---

[1] This Compensation Framework for Business Claims does not apply to (i) start-up businesses and (ii) failed businesses.  Compensation frameworks for these types of businesses will be presented separately.

1

**R.E.2**

following Benchmark Periods: 2009; the average of 2008-2009; or the average of 2007-2009, provided that the range of years selected by the claimant will be utilized for all Benchmark Period purposes.

**Claimant-Specific Factor**: In order to capture the impact of pre-DWH Spill trends in the claimant's revenue performance that might have been expected in the post-DWH Spill Benchmark Period, revenue will be adjusted by a Claimant-Specific Factor. The following steps will be used to compute the Claimant-Specific Factor:

  A. Calculate the difference between claimant's total revenue for January through April 2010 and total revenue in January through April of the corresponding claimant – selected Benchmark Period.

  B. Divide the revenue change calculated in Step A by total revenue in January through April of the Benchmark Period to derive the Claimant-Specific Factor. If the calculated Claimant-Specific Factor falls below -2% or exceeds +10%, then it will be set at -2% or +10%, respectively.

**General Adjustment Factor**: In addition to the Claimant-Specific factor, all Claimants shall be entitled to a 2.0% General Adjustment Factor.

**Variable Profit**: This is calculated for both the Benchmark Period and the Compensation Period as follows:

1. Sum the monthly revenue over the period.
2. Subtract the corresponding variable expenses from revenue over the same time period. Variable expenses include:
   a. Variable Costs as identified in Attachment A.
   b. Variable portion of salaries, calculated as described below in the definition of Fixed and Variable Payroll Expenses.
   c. Variable portion of COGS, calculated by excluding salary costs (which are discussed below in the definition of Fixed and Variable Payroll Expenses) and fixed expenses included within COGS, including Amortization, Depreciation, Insurance Expense, and Interest Expense and Contract Services.

**Variable Margin**: This is calculated only for the Benchmark Period and is calculated as follows:

1. Sum Variable Profit from May through December of the years selected by the claimant to be used for the Benchmark Period.
2. Sum total revenue from May through December of the years selected by the claimant to be used for the Benchmark Period.
3. Calculate Variable Margin percent as Variable Profit calculated in (1) divided by total revenue calculated in (2).

2

**R.E.3**

**Fixed and Variable Payroll Expenses:** Fixed and Variable Payroll Expenses are calculated based on the understanding that every business must operate with a minimum core staff and are defined using monthly profit and loss statements and/or those documents listed in the Documentation Requirements for Business Claims, for May through December 2010. Fixed and Variable Payroll expenses are calculated as follows:

1. Obtain monthly amounts for the following payroll expenses (excluding Owner/Officer Compensation): (a) Salaries & wages; (b) Payroll taxes (including FICA, workers compensation insurance, unemployment tax); (c) Employer costs for employee benefits. Calculations include components of salaries and related expenses included in both Selling, General & Administrative Expenses ("SG&A") and COGS.
2. Sum these payroll expenses on a monthly basis to determine the Total Payroll Expense for each month.
3. Identify the two months between May and December 2010 with the lowest Total Payroll Expense.
   - Months in which the claimant has zero revenue, zero non-officer payroll expenses, or the business is closed, will be excluded from this calculation.
4. Define "Fixed Payroll Expenses" as the average payroll expense over the two months with the lowest Total Payroll Expense.
5. For any month with Total Payroll Expenses less than Fixed Payroll Expenses, all payroll costs will be considered fixed expenses.
6. For any month with Total Payroll Expenses greater than Fixed Payroll Expenses, the excess amount of Total Payroll Expenses will be considered variable expenses.

**Incremental Revenue:** Incremental revenue shall be calculated as (i) the claimant's revenue in a claimant-selected period of six, seven or eight consecutive months (as set forth in Step 2 below) between May and December of the years selected by the claimant to be included in the Benchmark Period, multiplied by (ii) the Claimant-Specific Factor and the General Adjustment Factor.

II.   **Description of Compensation Calculation**

**Step 1 Compensation**

Step 1 of the compensation calculation is determined as the difference in Variable Profit between the 2010 Compensation Period selected by the claimant and the Variable Profit over the comparable months of the Benchmark Period.

As noted above, the Compensation Period is selected by the Claimant to include three or more consecutive months between May and December 2010.

026296
USCA5 6476

**R.E.4**

**Addendum To**
**Causation Requirements For Business Economic Loss Claims and**
**Compensation Framework for Business Economic Loss Claims**

The term "Benchmark Period" is defined at pp. 1-2 in the **Compensation Framework for Business Economic Loss Claims** (Ex. 4C).  That definition provides:

> The Benchmark Period is the pre-DWH Spill time period which claimant chooses as the baseline for measuring its historical financial performance.  The claimant can select among the following Benchmark Periods: 2009; the average of 2008-2009; or the average of 2007-2009, provided that the range of years selected by the claimant will be utilized for all Benchmark Period purposes.

Footnote 2 of the **Causation Requirements For Business Economic Loss Claims** (Ex. 4B) specifically incorporates that definition of Benchmark Period by reference.

Accordingly, once the claimant selects the Benchmark Period year(s) (2009, the average of 2008-2009, or the average of 2007-2009), the **same** Benchmark Period year(s) are used "for all Benchmark Period purposes" -- specifically, the same Benchmark Period year(s) are used for purposes of determining **both** causation and compensation.

In contrast, a claimant is not required to use the same **months** in the Benchmark Period for purposes of establishing causation pursuant to Ex. 4B and determining compensation pursuant to Ex. 4C.

For example, when evaluating whether a claimant can satisfy causation using the "V Test," the claimant may select any consecutive 3-month period between May and December 2010 for comparison to a comparable period in the Benchmark Period (i.e., 2009, the average of 2008-2009, or the average of 2007-2009).  After establishing causation, however, the claimant may select a different 3 or more consecutive months between May and December 2010 in determining compensation in accordance with the **Compensation Framework for Business Economic Loss Claims,** so long as the claimant uses the same Benchmark Period years as the basis for comparison.  Thus, if the claimant selected for *causation* the three months of May - July in the Benchmark Period years of the average of 2008-2009, the claimant can select for *compensation* different months -- e.g., August - October -- but must use the same average of 2008-2009 Benchmark Period.  The same Benchmark Period year(s) thus must be used both for causation (Ex. 4B) and compensation (Ex. 4C).

The additional examples on the next page illustrate these rules:

Scenario 1:

1) Claimant selected the months of May-July 2010 for the purpose of determining causation, and the claimant, using these months, meets the causation test for the Benchmark period years of 2009, 2008-2009 and 2007-2009;

2) In determining Compensation, Claimant would be allowed to select the months of August through November 2010 as compared to the months of August through November in either 2009, 2008-2009 or 2007-2009 as the Benchmark years – whichever provides the highest compensation.

Scenario 2:

1) Claimant selected the months of October – December 2010 for the purpose of determining causation and the claimant, using these months, meets the causation test for the Benchmark period years of 2009, 2008-2009;

2) In determining compensation, Claimant could select the months of May-September 2010 as compared to the months of May-September in either 2009 or 2008-2009 – whichever provides the highest compensation.

Scenario 3:

1) Claimant selected the months of June – August 2010 for the purpose of determining causation and the claimant, using these months, meets the causation test for the Benchmark period year of 2009.  In addition, Claimant selected the months of August – October 2010 for the purpose of determining causation, and the claimant, using these months, meets the causation test for the Benchmark period years of 2007-2009;

2) In determining compensation, Claimant could select the months of May-December 2010 as compared to the months of May-December in either 2009 or 2007-2009 – whichever provides the highest compensation.

**R.E.6**

**2.  BEL Policy Decision Cover E-Mail**

## Moskowitz, Keith

| | |
|---|---|
| **From:** | Rebecca Foreman [rforeman@dheclaims.com] on behalf of Patrick Juneau [pjuneau@dheclaims.com] |
| **Sent:** | Tuesday, January 15, 2013 9:33 AM |
| **To:** | Mark Holstein (Mark.Holstein@bp.com); Moskowitz, Keith; 'James Roy (jimr@wrightroy.com)' (jimr@wrightroy.com); Steve Herman (SHERMAN@hhklawfirm.com) |
| **Cc:** | Orran L. Brown; Lynn Greer (lgreer@browngreer.com); Michael J. Juneau (MJJ@juneaudavid.com) (MJJ@juneaudavid.com); Christine Reitano |
| **Subject:** | January 15, 2013 Policy Announcement |
| **Attachments:** | BROWNGREER-#418993-v1-CA_Policy_Announcement-1-15-13.DOCX |

Gentlemen:

The Claims Administrator has thoroughly considered the submissions of both Parties regarding the proper measurement of revenue and expenses for those BEL claimants with particularly variable revenues.  This is an issue that has particular relevance to claimants who are attorneys, construction companies or farming enterprises.  The Claims Administrator recognizes that the straightforward application of the Settlement Agreement's compensation formula to claimants in these industries can result in awards that appear disproportionate when compared to award amounts for claimants in other industries.  BP has proposed alternative frameworks whereby claims within these industries would be carved out for additional analysis and/or a revised analysis would be utilized to compute compensation for certain types of claims. The Claims Administrator recognizes that the type frameworks proposed by BP constitute a reasonable approach to evaluating such claims.  But the Claims Administrator does not view it within his authority to carve out specific types of claims in this fashion nor to apply a revised formula or analysis for selected types of claimants.  The specific charge to the Claims Administrator is to apply the terms of the Settlement Agreement *as written*.  When so applied in this instance, the result can be disproportionate awards for certain types of claims.  Though the Claims Administrator acknowledges that the type approach proposed by BP is a reasonable one, he does not believe it within his authority to implement such an approach absent agreement of the parties or express direction from the Court.

Attached is the Claims Administrator's Policy Announcement of January 15, 2013, which sets forth my policy decision on this issue.

Thanks,

**Patrick A. Juneau**
*Claims Administrator*

**DEEPWATER HORIZON**
**CLAIMS CENTER**

**504-934-4999**

### 3.   Claims Administrator's BEL Policy Decision

CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

## MEMORANDUM

TO:       **Class Counsel**
          **BP**

FROM:     **Patrick A. Juneau, Claims Administrator**

DATE:     **January 15, 2013**

RE:       **Announcement of Policy Decisions Regarding Claims Administration**

───────────────────────────────────────────────────────────

      Under the terms of the Deepwater Horizon Economic and Property Damage Settlement Agreement ("Settlement Agreement"), the Claims Administrator is charged with the duty to "faithfully implement and administer the Settlement, according to its terms and procedures, for the benefit of the Economic Class, consistent with this Agreement, and/or as agreed to by the Parties and/or as approved by the Court." (Section 4.3.1 of the Settlement Agreement). Further, the Claims Administrator is charged with the responsibility to "work with Economic Class Members . . . to facilitate . . . assembly and submission of Claims Forms, including all supporting documentation necessary to process Claims Forms under the applicable Claims Processes . . . [and to] provide Economic Class Members with assistance, information, opportunities and notice so that the Economic Class Member has the best opportunity to be determined eligible for and receive the Settlement Payment(s) to which the Economic Class Member is entitled under the terms of this Agreement." (Section 4.3.7 of the Settlement Agreement).

      In accordance with these provisions, the Claims Administrator has adopted the following policies affecting the administration of claims under the Settlement Agreement. These polices will be the subject of the 1/16/13 session of the Claims Administration Panel and are not to be made public until after those proceedings have been concluded.

    *1.  **Business Economic Loss Claims:  Calculation of Variable Profit.***

      Exhibit 4C of the Settlement Agreement sets out the methodology to be used in calculating Variable Profit as a component of determining Step 1 Compensation.

That methodology is as follows:

    (1) Sum the monthly revenue over the period.

    (2) Subtract corresponding variable expenses from revenue over the same time period. Variable expenses include:

        (a) Variable Costs as identified in Attachment A.

418993

1

**R.E.8**

CLAIMS CENTER
ECONOMIC & PROPERTY DAMAGE CLAIMS

(b) Variable portion of salaries, calculated as described below in the definition of Fixed and Variable Payroll Expenses.

(c) Variable portion of COGS, calculated by excluding salary costs . . . and fixed expenses included within COGS, including Amortization, Depreciation, Insurance Expense, and Interest Expense and Contract Services.

In performing these calculations, the Claims Administrator will typically consider both revenues and expenses in the periods in which those revenues and expenses were recorded at the time. The Claims Administrator will not typically re-allocate such revenues or expenses to different periods. The Claims Administrator does, however, reserve the right to adjust the financial statements in certain circumstances, including but not limited to, inconsistent basis of accounting between benchmark and compensation periods, errors in previously recorded transactions and flawed or inconsistent treatment of accounting estimates.

### 2. *Business Economic Loss Claims: Timing of Revenues for Purposes of Causation.*

Exhibit 4B of the Settlement Agreement sets out the methodology to be used in assessing causation. That methodology largely concerns consideration of total net revenues before the spill vs. total net revenues after the spill. In performing these calculations, the Claims Administrator will typically consider revenues in the periods in which those revenues were recorded at the time. The Claims Administrator will not typically re-allocate such revenues to different periods. The Claims Administrator does, however, reserve the right to adjust the financial statements in certain circumstances, including but not limited to, inconsistent basis of accounting between benchmark and compensation periods, errors in previously recorded transactions and flawed or inconsistent treatment of accounting estimates.

418993

**R.E.9**

USCA5 25163

# 4.   March 5, 2013 Order on Variable Profit

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

In re: Oil Spill by the Oil Rig     \*    **MDL No. 2179**
    "Deepwater Horizon" in the Gulf     \*
    of Mexico, on April 20, 2010     \*    **SECTION "J"**
    \*

This Document Relates To:     \*    **JUDGE BARBIER**
No. 12-970     \*
    \*    **MAGISTRATE SHUSHAN**

### Review of Issue from Panel (Matching of Revenue and Expenses)

Before the Court is a motion by BP, asking the Court to review and reverse the Claims Administrator's January 15, 2013 policy decision interpreting certain portions of the Economic Settlement Agreement.[1]

Accordingly, the Court has re-visited the issue of whether the Claims Administrator has correctly interpreted the terms of the Economic and Property Damage Settlement Agreement as it applies to the calculation of "Variable Profit" for Business Economic Loss Claims.

After fully reviewing the additional materials submitted by the parties and the relevant portions of the Settlement Agreement, the Court affirms the Claims Administrator's interpretation as set forth in the January 15, 2013 Announcement of Policy Decisions Regarding Claims Administration.

Nowhere does the Agreement state or indicate that revenue and expenses must be "matched" or revenues "smoothed," nor does it state that one should inquire into when revenue was "earned."

---

[1]Following the vacation of the Court's prior ruling in an email dated January 30, 2013, the parties have made further submissions to the Court and have met with Dan Balhoff, court appointed neutral, both privately and jointly. Mr. Balhoff also had the opportunity to meet with the Claims Administrator, Pat Juneau, and representatives of his professional accounting staff. The Court met with Mr. Balhoff on February 19, 2013 and received a report from him regarding his efforts. Mr. Balhoff reported that there is no likelihood of a negotiated resolution of the dispute. The fees of Mr. Balhoff for his participation in attempting to resolve this dispute shall be paid by BP as part of the cost of claims administration.

**R.E.10**

Rather, the provisions of Exhibit 4C and 4A, when read together, support the Claims Administrator's interpretation.

> For example, Step 1 of the of Exhibit 4C's Compensation Framework states:
>
> Step 1 of the compensation calculation is determined as the difference in Variable Profit between the 2010 Compensation Period selected by the claimant and the Variable Profit over the *comparable* months of the Benchmark period.

Exhibit 4C p. 3 (emphasis added); *see also id.* at 1 ("**Step 1** – Compensates claimants for any reduction in profit between the 2010 Compensation Period selected by the claimant and the *comparable* months of the Benchmark Period.  Step 1 compensation reflects the reduction in Variable Profit (which reflects claimant's revenue less its variable costs) over this period." (emphasis added)).  The meaning of "comparable" is illustrated by the examples provided in Exhibit 4C:

> Scenario 1:
> 1) Claimant selected the months of May-July 2010 for the purpose of determining causation, and the claimant, using these months, meets the causation test for the Benchmark period years of 2009, 2008-2009 and 2007-2009;
> 2) In determining Compensation, Claimant would be allowed to select the months of August through November 2010 *as compared to the months* of August through November in either 2009, 2008-2009 or 2007-2009 as the Benchmark years – whichever provides the highest compensation.
>
> Scenario 2:
> 1) Claimant selected the months of October – December 2010 for the purpose of determining causation and the claimant, using these months, meets the causation test for the Benchmark period years of 2009, 2008-2009;
> 2) In determining compensation, Claimant could select the months of May-September 2010 *as compared to the months* of May-September in either 2009 or 2008-2009 – whichever provides the highest compensation.
>
> Scenario 3:
> 1) Claimant selected the months of June – August 2010 for the purpose of determining causation and the claimant, using these months, meets the causation test for the Benchmark period year of 2009.  In addition, Claimant selected the months of August – October 2010 for the purpose of determining causation, and the

2

**R.E.11**

> claimant, using these months, meets the causation test for the Benchmark period
> years of 2007-2009;
> 2) In determining compensation, Claimant could select the months of May-December
> 2010 *as compared to the months* of May-December in either 2009 or 2007-2009 –
> whichever provides the highest compensation.

Exhibit 4C, Addendum.  These examples make clear that the same months of the Compensation

Period are to be compared with the months in the Benchmark period; not, as BP urges, that the

Claims Administrator's accountants should seek out months where the claimant engaged in

comparable activity.  Notably, this is the exact interpretation BP advocated while the parties

negotiated the Settlement Agreement:

> The word "comparable" and phrase "comparable months of" is used throughout the
> document in the context of comparing the months selected by the Claimant in 2010
> to compare against the *same months* in the Benchmark Period.

E-mail from Richard Godfrey to Joe Rice and Calvin Fayard (Feb. 17, 2012), Ex. 3 to PSC

Submission (emphasis added).

The heart of this dispute, however, appears to center on the word "corresponding" as it is

used in the calculation of "Variable Profit" (which, in turn, is used in Step 1 of the Compensation

Framework):

> Variable Profit: This is calculated for both the Benchmark Period and the
> Compensation Period as follows:
> 1. Sum the monthly revenue over the period.
> 2. Subtract the *corresponding* variable expenses from revenue *over the same
> time period*. . . .

Exhibit 4C at 2 (emphasis added).  The question is whether variable expenses must correspond to

the revenue those expenses produced, as BP contends, or whether variable expenses must correspond

to "the same time period," as Class Counsel contends. BP claims that Class Counsel's interpretation

ignores "corresponding;" Class Counsel claims that BP's interpretation ignores "the same time

**R.E.12**

period."

The Court adopts Class Counsel's interpretation as it is most in line with the rest of the Settlement Agreement. For example, the documentation provisions contained within Exhibit 4A make it clear that the Program's analysis is to be based on revenue and expenses during the relevant periods chosen by the claimant, as reflected in historical business records. Specifically, the Framework requires:

> Monthly and annual profit and loss statements (which identify individual expense line items and revenue categories), or alternate source documents *establishing monthly revenues and expenses for the claimed Benchmark Period, 2010 and, if applicable, 2011.*

Exhibit 4A ¶ 4 (emphasis added, footnotes omitted). If expenses had to be "matched" to revenues, then the Settlement Program would potentially need to consider financials that pre-date the Benchmark Period. Likewise, Exhibit 4A does not require that accounting occur on an "accrual" basis, as opposed to a "cash" basis.[2] Similarly, Exhibit 4C's examples quoted above reflect that the Framework is based on the expenses and revenues that were recorded in the Claimant-selected months, not expenses and revenues that occurred outside these months. Furthermore, although a claimant may select the Benchmark and Compensation Periods, his choice is subject to certain restrictions. Notably, the Benchmark and Compensation Periods must be a minimum of three consecutive months. This demonstrates that the parties anticipated that too short a snapshot could create "anomalies," and the three-month minimum was the agreed-upon method for controlling for

---

[2] On a related note, Exhibit 4A ¶¶ 5, 6 does require certain additional documents for certain types of businesses and for certain types of causation tests. However, Exhibit 4A does not require extra documents or a specific type of accounting for the businesses that are the subject of the instant dispute. Similarly, while the Settlement Agreement permits the Claims Administrator to exercise his discretion to request *source* documents for profit and loss statements; it appears that this is to ensure that the statements are accurate and consistent, not that they use one accounting method over another. *See* Exhibit 4A ¶ 4 ("If there is a discrepancy between amounts reflected in a tax return and comparable items reflected in a profit and loss statement for the same period, the Claims Administrator may request the claimant to provide additional information or documentation.").

**R.E.13**

such anomalies. *See* Fishkind Decl. ¶ 87;[3] Henley Decl. ¶ 30 (submitted with BP's motion for final approval).

With respect to BP's argument that this interpretation of the Settlement Agreement can create absurd results, BP's declarant acknowledges that class settlement payments do not always perfectly match economic losses in every instance. Polinsky Declaration, p.5 n.8, Ex. 9 to BP's submission. BP's counsel similarly explained that "false positives" are an "inevitable concomitant of an objective quantitative, data-based test." Letter from Mark Holstein to Patrick Juneau (Sept. 28, 2012), p. 3, Ex. 12 to PSC's Submission.

And, as mentioned above, the parties agreed to give Claimants flexibility in choosing the most favorable Compensation and Benchmark Periods. Indeed, the Settlement Agreement provides that if a Claimant fails to select the period that generates the greatest recovery, the Program will choose that period for him. Objective formulas, the possibility of "false positives," and giving claimants flexibility to choose the most favorable time periods are all consequences BP accepted when it decided to buy peace through a global, class-wide resolution. In light of this, to the extent that the Claims Administrator's interpretation produces "false positives" or, as BP claims, "absurd" results, it appears that the Settlement Agreement anticipates that such results would sometimes occur.

The overarching theme of the Settlement is a transparent, uniform application of an objective quantitative data-based test which can be fairly and efficiently administered by the Claims Administrator. Notably, the Settlement Agreement itself defines those businesses that lost profits,

---

[3] "[T]he requirement that the Benchmark and Compensation periods used to measure decline and recovery be measured over at least 3 months is a reasonable means of ensuring that the data reflect a genuine trend in economic performance and not just routine month-to-month variation that any business can expect even absent any unusual event."

5

USCA5 21003

income, and/or earnings "as a result of" the Spill as those businesses that meet the objective

causation requirements set forth in Exhibit 4B.  Once the Settlement's causation formula is met, then

all losses calculated under Exhibit 4C are presumed to be attributable to the oil spill.  BP's

interpretation injects a subjective notion of alternative causation and a degree of complexity that are

contrary to the Settlement's terms.

New Orleans, Louisiana, this 5th day of March, 2013.

_____
United States District Judge

**R.E.15**

USCA5 21004

## 5.   Advertisements of Plaintiffs' Lawyers



Webpage Screenshot

sponsor: Tracee Ivins, Attorney - Tampa, Florida

# BP Business Fund

Call Us Now for a Free Consultation:
**1-800-379-4033**

Home   Online Signup   BP Settlement   Who Qualifies?   Map   Examples   Why Hire Us?

Did you Know There is a
New BP Settlement Fund?

The new BP Settlement Fund may pay
up to 3.5 X your losses!

**Get Started Now**

## Client Examples

Here are a couple of examples of different businesses who qualify under the BP settlement.

### Revenues Increased But Still Eligible for Significant Compensation

- One gas station with a convenient store in northern Louisiana showed a $16,000 increase in income on their tax returns from 2009 to 2010. However, after our team of experts analyzed this client's monthly sales and use tax returns and their monthly profit and loss statements, we were able to prove that this client experienced a loss between May and December of 2010, as compared to prior years. BP has offered over $175,000 to this client.

- A bicycle retailer located in Florida had 2009 revenues of $1,922,547 and 2010 revenues of $2,428,270. (An increase of over $500k-) Based on the compensation formula in the Settlement Agreement, however, we were able to file a claim for almost one million dollars.

### Why Can You Recover Even if Your Revenues Increases?

The reason is that the compensation formula takes into account your business' "variable profits", which is defined in the Settlement Agreement, not according to GAAP accounting standards. Also, the formula applies a Claimant-Specific growth factor that captures incremental profits that might have been expected to be generated in 2010 in the absence of the spill, based on your business' revenue growth in prior periods. Finally, a variable margin multiplier may be applied depending on the circumstances.

### Started Business After the Oil Spill — Still Can Claim

Even if your business commenced operations after the April 2010 oil spill, there is a compensation framework specifically designed to compensate for the business' lost potential growth.

Call us at **1-800-379-4033** for a copy of the settlement and to discuss your claim.

**Find Out More About:**
Map of Covered Areas or Types of Businesses Covered



**Get Your Claim Filed
as Quickly as Possible**

Salutation
Select

First Name                Last Name

Address                   City

State                     Zip Code
Please Select             

Phone                     E-Mail

Type of Claim
○ Individual   ○ Business

Industry
Please Select

Estimated Loss
Please Specify

Have you accepted a quick
payment or final payment from the
GCCF/BP?
○ Yes              ○ No
Comments or Questions?

**Submit Form**   🔒 We value your privacy



BBB
ACCREDITED
BUSINESS
A+ RATING

Tracee L. Ivins. Office Location: Tampa, FL - Contact Tracee L. Ivins for more information. Danziger & De Llano, LLP - Principal office Houston, Texas. Prior results do not guarantee or predict a similar outcome with respect to any future matter. Attorney advertising. No representation is made that the quality of the legal services to be performed is greater than the quality of legal services performed by other lawyers. Tracee L. Ivins is licensed to practice law in the State of Florida.

Our Privacy Policy

http://bpbusinessfund.com/client-examples/



Available to meet in Clearwater, Tampa, and St. Pete

CALL TODAY FOR A FREE CONSULTATION
**877-594-6234**

HOME | ATTORNEY PROFILES | PRACTICE AREAS OVERVIEW | BLOG | CONTACT US | MAPS & DIRECTIONS | CLIENT CENTER



## FULL SERVICE LAW FIRM
Helping People With All Their Legal Needs

### BP OIL SPILL CLAIMS



The laws have changed regarding the ability of business and property owners to make a successful claim. There is no liability or cost to you to find out if you qualify for a claim.

**LEARN MORE**

### SECURITY CLEARANCE



There are currently nearly a dozen active military installations in the state of Florida, and the St. Petersburg-Clearwater-Tampa area is host to...

**LEARN MORE**

### CREDIT CARD & DEBT SETTLEMENT



Times are tough, and keeping up with your monthly expenses can be challenging. A sudden job loss, accident, extended illness or family emergency can be all it takes to put you...

**LEARN MORE**



Perry Draper PLLC
Clearwater Bankruptcy Lawyer

## YOUR FLORIDA LAWYER FOR BP OIL SPILL CLAIMS AND COMPENSATION

**FIND OUT IF YOU QUALIFY - IT'S FREE!   CLICK HERE TO START**



Arthur Draper esq.
Your Florida Lawyer for BP Oil Spill Claims

The BP oil spill was an ecological and economic disaster in April 2010, whose effects are still being felt today. Rather than face an endless stream of lawsuits which would be sure to put them out of business by massive punitive damage judgments, BP has agreed to a claims process - overseen by the government - by which people who suffered economic loss due to the disaster can be compensated.

### Do I Qualify for a BP Claim?

Find out! It's FREE! Under the new rules, the test is strictly financial. *In our experience, about 80% of all businesses qualify for BP oil compensation.* If the numbers work, there is no need to provide proof that BP caused your loss - the law *presumes* that BP caused the loss. This is what BP agreed to. You will not need to provide other evidence or testimony.

If you pass the test, known as the v-trend, then you qualify. This test is purely financial and is based on a comparison of your gross revenue from ANY 3 consecutive months in 2010 and comparing it to a large combination of months going back to January 2007. We only need to compare 3 consecutive months from 2010!

If you qualify, then it is only a matter of determining how much you will get back. This can be anywhere from 125% to 350% of your loss, depending upon the type of business you are in, your location or zone, your variable expenses and certain other factors.

"My message to everyone is 'When in doubt, file a claim.' Doesn't cost you a nickel. We want eligible people to get paid." - Patrick Juneau, Attorney in charge of BP Payout, quoted in an August 2012 blog at AL.com.

### How do I begin?

Complete our BP Oil Spill Overview Worksheet and send it to our office via email, fax or mail. We can let you know in a day or two if you have a claim. If you do, we will gather the necessary information and take it from there, preparing and processing the required documents and submitting your claim to BP. You could be receiving payment within 60-90 days from the time we submit your claim.

This process is completely *CONFIDENTIAL!*

Get Started on Your BP Oil Claim Today

**R.E.17**

USCA5 25209

We want everybody who is eligible for compensation to get paid. If you are in doubt about whether you qualify, it won't cost you anything to file a claim. Hiring a BP oil compensation lawyer from our firm in Florida won't cost you a dime. You will not be charged to pay any expenses related to your claim out of your pocket, so there is absolutely no risk or liability to you. We only get paid if we collect for you. Moreover, the entire process is completely confidential, so the public will never know you filed a claim if you don't want them to. The deadline to file a claim is April 2014, and after that, your ability to be compensated for economic loss in this period may be gone forever. Don't wait any longer to find out if you qualify for BP oil compensation. Contact Perry Draper Law today.

## Why Choose Perry Draper Law to Help You with Your BP Oil Spill Claim in Florida

As you can imagine, the claims process is not simple, and payment is not guaranteed. However, many changes to the law were made in 2012 which have proved to be very favorable to businesses who suffered economic loss since the spill. Our lawyers are well-versed in the law - including the most recent changes - and are experienced in successfully handling BP oil claims in Florida. Our team includes accountants and former BP personnel who set up the claims system and created the algorithm used to calculate benefits. We have never been denied a BP oil claim and have obtained compensation for every client who passes the test.

## Common Questions

Q: I don't think BP caused my loss.
A: As long as the numbers pass the test, the law presumes BP caused the loss, and we do not have to prove anything further.

Q: I thought this was only for the people on the beach.
A: No, the zones for those eligible go well inland!

Q: How much will this cost me?
A: Nothing out of pocket! If we do not collect, you owe us nothing!

Q: I made more money in 2010.
A: That does not mean you will not qualify. We are only looking at 3 months in 2010 and not the whole year!

Q: Is this worth my time?
A: Yes, our clients' claims range from tens of thousands to hundreds of thousands!

Perry Draper Law is located in Clearwater, FL and serves clients in and around Tarpon Springs, Largo, Clearwater, Safety Harbor, Clearwater Beach, Seminole, Belleair Beach, Saint Petersburg, Indian Rocks Beach, Oldsmar and Pinellas County.

CLIENT CENTER LOGIN

CONTACT

28870 U.S. Highway 19 N
Suite 300
Clearwater, FL 33761

877-594-6234 Tel
866-480-8409 Fax

NAVIGATION

• Home
• Attorney Profiles
• Practice Areas Overview
• Blog
• Contact Us
• Maps & Directions
• Client Center
• Perry and Draper PA Privacy

PRACTICE AREAS

• Bankruptcy
   ◦ Debt Settlement & Foreclosure Defense
   ◦ Credit Card Relief
• Personal Injury
• Employment Law
• Labor Law Violations
   ◦ Unpaid Wages in FL
   ◦ Consumer Law
• Employment Agreements
• Business Law
• Security Clearance
• BP Oil Spill

RECENT BLOG POSTS

• Florida Chapter 7 Exemptions
• The Florida Deceptive and Unfair Trade Practices Act Explained
• Child Labor Laws in Florida
• Determining Liability in a Personal Injury Accident

Avvo   f

Attorney Advertising. This web site is designed for general information only. The information presented at this site should not be construed to be formal legal advice nor the formation of a lawyer/client relationship. [ Site Map ] [ Bookmark Us ]

See our profile at Lawyers.com or Martindale.com

LexisNexis, Martindale-Hubbell and the Knowledge Burst logo are registered trademarks of Reed Elsevier Properties Inc., used under license. Other products or services may be trademarks or registered trademarks of their respective companies. © 2012 LexisNexis. All rights reserved.

LexisNexis · Martindale-Hubbell

http://www.perrydraperlaw.com/st-petersburg-clearwater/bp-oil-spill/

**R.E.18**

**6.   Excerpts of Declaration of
J. Lester Alexander, III**

beginning and end dates of the project in the manner discussed in paragraph 46 of the declaration of Hal Sider. For projects begun in 2011 or earlier which are not complete at the time the claim is submitted, total expected billings, costs to date and estimated costs to complete would be provided as of the most recent year end (and as included in year-end tax filings).

27.    In the following example, claimants provided job-specific reports. Exhibit 5 to my declaration contains a job schedule submitted by an actual claimant in support of their claim (the full job schedules are included in document ████ beginning on page 59). This schedule is typical of the information maintained by construction companies and can generally be obtained from project management software or year-end tax records. In this example, the claimant performed work on 56 total projects over the four years provided.

28.    As illustrated in Exhibit 6, it is a simple task to calculate each project's profitability and properly match revenues and expenses on a monthly basis using the job costing information. Revenues are earned over the course of a project as work is performed, and work performance is measured using the expenses incurred on the job over a given time period. It is a mathematical computation to properly match the revenues with expenses as follows:

Step 1: Divide total revenues by the total corresponding variable expenses for each project. This yields a revenue/cost ratio for every project.

Step 2: Match the revenue to the monthly cost by multiplying each project's actual monthly cost by its revenue/cost ratio calculated in Step 1 to determine the revenue earned in a month.

29.    Exhibit 6 is an illustration of the steps described above that sums to provide monthly and annual revenue totals for each job. The data entry required for this example was routine and completed by support staff.

### *The CSSP Accountants Are Detecting Matching Errors But Corrections Are Not Being Made*

30.    A review of CSSP claim files on appeal indicates that the CSSP Accountants are corresponding with claimants and identifying revenue and expense matching issues and inaccuracies as discussed above consistent with the approach proposed by BP. They are making inquiries, performing quantitative financial analysis, checking the accuracy, and testing the reliability of the accounting data provided by Claimants. However, in many cases they are not

**R.E.19**

making needed corrections for the matching issues and inaccuracies their work is finding in Claimant monthly financial statements.

31.    I reviewed twelve claimant files including 

These files demonstrate that the CSSP Accountants are identifying the same types of issues that BP's approach is designed to detect and correct. They are finding negative revenue, negative expenses, revenue spikes and other indicia of revenue and expense matching issues and inaccuracies. They are finding year-end correcting entries recorded in the last month of the year instead of the month of the error. They are finding large year-end adjustments for bad debt expense, commission expense and percentage-of-completion revenue. They are also finding discrepancies between net income on the financial statements and net income reported on the tax returns. These examples are discussed in more detail in Exhibit 4. In addition, examples of matching issues and inaccuracies found in these files are illustrated in Exhibits 4.1 through 4.7.

32.    Based on my experience at PwC, I have no doubt that the CSSP accountants have the capabilities and resources to implement BEL Framework using the approach proposed by BP to identify and correct errors and irregularities in the financial statements submitted by claimants. PwC is a global network of more than 180,000 professionals with U.S. revenue of more than $10 billion in 2012. Its professionals routinely provide audit, tax and consulting services to some of the largest, most sophisticated and complex companies in the world.[10] Postlethwaite has nine locations and 500 employees, including more than 50 directors and associate directors, most of whom are CPA's. They have provided accounting, consulting, and technology services to individuals and businesses throughout the country for over 60 years.[11] Both PwC and Postlethwaite have quality control standards designed to assure that the work of their personnel is properly planned, supervised and executed in ways to meet their professional standards. PwC

---

[10] See, e.g., www.pwc.com

[11] See, e.g., www.pncpa.com

**R.E.20**

## Analysis of Claim Files

| Claimant | Claim Number | Issue(s) | Disposition |
|---|---|---|---|
| | | Attorney letter included with file notes claimant recorded negative expenses in October 2008 relating to income from an event held at the Center in September of the same year  CSSP did not reclassify resulting in a large expense in September and a large income in October which distorted the claim | Uncorrected |
| | | CSSP inquired and learned cumulative commission "adjustments" were made in November and December of 2007 and 2008  Result was to overstate commission income throughout the year  CSSP wanted to unwind these entries through "posting the relevant amounts to the appropriate months" per the global notes | Correction Attempted |
| | | CSSP inquired and learned claimant received an $18,100 insurance payment to "offset repairs to the computer system in a combine"  Amount was posted in total to a month different than the actual repair payments resulting in incorrect amount both in the month repairs were recorded and again in the month the insurance proceeds were recorded as income | Uncorrected |
| | | CSSP inquired and learned claimant made cumulative adjustments to percentage of completion accounts only in June and December of each year  This cumulative adjustment was left entirely in those months meaning they are misstated as well as the 5 prior months when the differences developed | Uncorrected |
| | | Claim notes indicate CSSP inquired regarding large negative revenue amounts recorded in December of each year  No documentation of any response, and amounts were not adjusted before calculating claim | Uncorrected |
| | | CSSP inquired and learned from claimant that books had been maintained using two different methods of accounting between benchmark and compensation years  CSSP also noted large discrepancies between book net income reported on tax return and book net income reported in submission  No resolution or correction based on this inability to reconcile this important information as specified in the Settlement Agreement | Uncorrected |
| | | CSSP inquired regarding large negative revenue in December 2007 and November 2009  No response included in file and claim processed including those two material errors  Zone D construction company claim ▆ awarded $4.8 million by the facility despite negative revenue and other obvious revenue misstatements  In response to CSSP inquiries, claimant disclosed errors overstating benchmark year profits by over $1 million but no correction was applied | Uncorrected |
| | | CSSP inquired about bad debts and learned they were written off in bulk at year end  No adjustment was made to match that expense with the original recording of revenue | Uncorrected |
| | | CSSP inquired and learned large payroll bonuses, a profit sharing contribution and a $600,000 payment related to 2004 were included in Dec 2009 results  No adjustments were made meaning variable profit was overstated for other months in year | Uncorrected |
| | | CSSP inquired regarding $787,088 of negative revenue recorded in Dec 2010  Claimant responded this amount represented expenses accumulated throughout the year and expensed (equivalent to negative revenue) all at once  While December was included in the compensation period, a portion of these expenses related to other months of the year, and therefore inappropriately lowered compensation period variable profit  No adjustment was made | Uncorrected |
| | | CSSP inquired and learned of a large sale recorded in July 2010 for which the materials were purchased and expensed in August 2010  No adjustment was made to properly record the sale in the proper periods  This created a large artificial loss in August 2010 (which was included in the compensation period while July 2010 was left out) generating an award to a company which was not damaged | Uncorrected |

**R.E.21**

**7.   Excerpts of Declaration of
A. Mitchell Polinsky**

apply systematically to some industries — such as construction and agriculture — but not to other industries — such as retailing.

9.   When it is likely that reliance on net cash received in determining compensation would lead to significant windfalls, compensation should be based on a methodology for estimating declines in economic profits.  In particular, the BEL Framework should be interpreted so as to accomplish this end.

## IV.   BACKGROUND

10.   The methodology for calculating compensation for business claimants is set out in the Business Economic Loss Framework of the Settlement Agreement.[3]  This process involves comparing "the actual profit of a business during a defined post-spill period in 2010 to the profit that the claimant might have expected to earn in the comparable post-spill period of 2010."[4]  The compensation amount bridges the difference between the measure of actual profits and the measure of profits that might have been expected.

11.   The BEL Framework requires a claimant to submit financial data regarding its operations, including information on revenue earned each month as well as on the corresponding costs incurred in generating that revenue.[5]

## V.   ANALYSIS

### A.   The Purpose of the Business Economic Loss Framework is to Make Claimants Whole

12.   The central feature of the BEL Framework of the Settlement Agreement is, as mentioned, that it compensates a claimant for the difference between the claimant's actual profits during a relevant post-spill period and an estimate of what the claimant's profits would

--------------------------------------------------

[3] Settlement Agreement, Exhibit 4C.

[4] Settlement Agreement, Exhibit 4C, page 1.

[5] Settlement Agreement, Exhibit 4A.

**R.E.22**

USCA5 24933

have been in that period had the spill not occurred.  Hence, use of the BEL Framework is designed to make claimants whole.

13.   Consideration of the economic analysis of settlement[6] also supports the view that the compensation provisions of the BEL Framework should be interpreted in terms of making claimants whole.  To elaborate, suppose that a plaintiff would obtain approximately $1 million in damages if he were to go to trial.  Then if the plaintiff were to demand substantially more than this amount in settlement — say he demanded $2 million — the defendant would refuse to settle since the defendant would expect to pay much less at trial.[7]  Similarly, if the defendant offered significantly less than the amount that the plaintiff would expect to obtain at trial, the plaintiff would refuse the offer.  In other words, if the parties settle, they would tend to settle for an amount that is not much different from the amount that the plaintiff would obtain in court.

14.   The amount that courts generally award for losses in tort is that which would make the plaintiff whole, namely, the amount that would restore the plaintiff to the position he would have enjoyed if the tort had not occurred.

15.   Hence, in this matter, I would expect that the BEL Framework would be designed to make claimants whole.  That is, I would not expect the BEL Framework to provide compensation that would result in substantial windfalls to claimants — it would have been economically irrational for BP to have consented to such an outcome.

16.   In sum, (a) the basic design of the BEL Framework supports the view that it is intended to make claimants whole, and (b) settlement agreements would generally be expected to reflect court awards, which are premised on the principle of making plaintiffs whole.

---

[6]  Steven Shavell, *Foundations of Economic Analysis of Law* (Harvard University Press, 2004), pages 401-02, and Kathryn E. Spier, Litigation, in A. Mitchell Polinsky and Steven Shavell (Editors), *Handbook of Law and Economics*, Volume 1 (Amsterdam: North-Holland, 2007), pages 268-69.

[7]  For simplicity, I abstract here from several complicating factors, including that the parties would bear litigation costs if they went to trial.

**R.E.23**

Hence, it is reasonable to conclude that the main objective of the BEL Framework is to compensate claimants so as to make them whole.[8]

**B.     Compensation Based on Losses of Economic Profits Will Make Claimants Whole**

17.    I illustrate the basic point here that if compensation is based on losses of economic profits, claimants will be made whole.

18.    *Economic profits* due to a specified period of business activity are the revenues that are generated by the activity — whenever they are received — minus the expenses associated with the activity — whenever they are incurred.

19.    Suppose, for example, that a business ABC was engaged in a commercial activity during a defined oil-spill period of July through September of 2010 and that the activity over this period ultimately generated revenues of $10,000 and led to expenses of $6,000.  Then ABC's economic profits from its activity during July-September 2010 are $4,000.

20.    Suppose too that it is known from past financial records that ABC typically makes economic profits of $15,000 from its business activity during the July-September period. It is thus assumed that ABC would have made profits of $15,000 during July-September 2010 if the oil spill had not occurred.

21.    Then it is patent that compensating ABC for the difference between its economic profits had the spill not occurred, $15,000, and its actual economic profits, $4,000, will make it whole.  This difference of $11,000 is ABC's economic loss as a result of the spill; and adding $11,000 to the $4,000 of economic profits that ABC did make would restore its profitability to $15,000.

---

[8]  I recognize, of course, that in a class action payments to claimants would not perfectly match economic losses in every instance.  Yet a settlement of a class action would not be expected to result in gross overpayments or windfalls to certain claimants.

**R.E.24**

USCA5 24935

**8.   Excerpts of Declaration of Hal Sider**

such as manufacturing (and others) which are typically not considered to have
suffered spill-related harm, again indicating that errors in the measurement of
variable profit distort offers under CSSP's implementation of the BEL framework.
(¶¶10-13)

- ○ Few BEL claimants in the construction, professional services and agriculture sectors
that have received large offers from CSSP had previously claimed that they had
suffered spill-related harm by submitting Short Form Joinders (SFJs) to the MDL
2179 Court.  Similarly, few manufacturing firms had submitted SFJs.  Along with
other evidence presented here, this indicates that many large CSSP offers to these
claimants are a result of measurement errors resulting in a windfall payment
unrelated to the spill. (¶¶14-16)

- ○ While the number of new BEL claims from tourism-based industries has been
declining, the number of new BEL claims is increasing from sectors such as
construction, professional services, agriculture and others that are subject to
significant error in the measurement of variable profit by the CSSP.  This indicates
that CSSP's actions are attracting new claimants that are likely to generate inflated
offers due to CSSP's reliance on flawed financial data to compute BEL claims. (¶¶17-
20)

- • CSSP's failure to properly identify when revenue was earned and failure to match revenue
with the corresponding variable expenses incurred to generate that revenue results in
systematic overcompensation for BEL claimants.  Distortions systematically increase BEL
compensation offers because the months in which the CSSP's measurement error increase
estimates of the claimant's lost variable profit are then selected from among the many
options available for the compensation and benchmark periods for determining BEL

3

**R.E.25**

USCA5 24965

compensation. This problem is avoided simply by utilizing financial data that properly identifies when revenue is earned and properly aligns revenue with the corresponding expenses incurred in generating that revenue. (¶¶ 21-28)

- Irregularities in financial data submitted by claimants to CSSP are common and can be readily identified.[1] I have used data from CSSP claims files for BEL claimants and I have implemented the "triggers" identified by BP in its second submission to the Claims Administrator. This analysis requires no information other than that contained in the BEL claims workbooks of the Settlement Program's accounting vendors. My analysis of BEL claims indicates that many claims in the construction, agriculture, professional services and other sectors are identified by empirical trigger tests that indicate the presence of errors in the measurement of when revenue is earned and failure to align revenue with the corresponding variable expenses. Application of the same triggers to BEL claims in other industries also indicates that such measurement problems by the CSSP are widespread, albeit somewhat less frequently than in the construction, agriculture, and professional services industries. (¶¶29-36)

- BP's four-step approach to identifying and correcting data inaccuracies and matching problems is workable and can be readily implemented across a wide range of industries. The four-step approach described in Section VI incorporates and further elaborates on the approach described in (i) BP's Response To Class Counsel's December 16, 2012 Request for Policy Determination on January 9, 2013 and (ii) BP's Further Submission in Response to Class Counsel's December 16, 2012 Request for Policy Determination on January 11, 2013.

---

[1] By "irregularities" I mean failure of financial statements to record accurately revenue when earned and to match it with corresponding variable expenses incurred to generate that revenue. That may be the simple result of how a firm records cash payments and receipts in the normal course of business and, for purposes of this analysis, irregularities is not intended to imply any intentional misrepresentation or error by the claimant.

4

**R.E.26**

**B. Few recipients of large CSSP offers from the farming, construction and professional services sectors signed SFJs.**

14.     The large majority of claimants in the construction, agriculture and professional services industries that received large BEL offers did not submit SFJs which identify their intent to participate in MDL 2179.  While participation in the Economic and Property Damages Settlement is not restricted to entities that signed SFJs, the fact that few of these BEL claimants with large offers had previously claimed harm from the spill strongly suggests that other factors, including errors in the measurement of lost variable profit, contribute to the large offers they receive.  This view is reinforced by the fact that claimants that wanted to seek damages against Transocean faced the "monitions deadline" to file their claims on or before April 20, 2011.[4]  Presumably, claimants that thought they had spill related claims would not have wanted to risk being unable to recover damages from Transocean and those who filed on or before the monitions deadline clearly preserved their ability to recover potential damages from all defendants named in the economic damages master complaint, and thus would also have been expected to file SFJs.

15.     I have examined the 471 BEL claims generating offers that exceed $500,000 through February 11, 2013, and I have identified which of these claimants had filed an SFJ.  As shown in Table 3, only 5.5% of construction claimants that received large BEL offers had signed SFJs.  Similarly, only 2.7% of the professional service claimants that received large BEL offers had signed SFJs; and less than 4% of claimants in agriculture and manufacturing claimants receiving large awards had signed SFJs.  In contrast, 70.8% of seafood processors and wholesalers that received large BEL offers had signed SFJs, and substantial percentages are also observed among retail claimants (41.4%), real estate claimants (30.4%), and other claimants in tourism-related industries.

---

[4] *See* MDL 2179 Rec. Doc. 569 (Oct. 19, 2010)

11

16.     The low levels of participation in the SFJ process by claimants in the construction, professional services, agriculture and manufacturing sectors indicate that many such claimants did not believe that they suffered any significant loss related to the spill and thus implies that large CSSP offers to such claimants are the likely product of errors in the measurement of lost variable profit that result in windfall payments unrelated to the impact of the DWH spill.

**Table 3**

**Large CSSP BEL Offers Matched to SFJ Data**

| Industry | All Large CSSP BEL Offers | Large CSSP BEL Offers Matched to SFJ | % of Total |
|---|---|---|---|
| Professional Services | 73 | 2 | 2.7% |
| Manufacturing | 29 | 1 | 3.4% |
| Agriculture | 26 | 1 | 3.8% |
| Construction | 91 | 5 | 5.5% |
| Health Care | 20 | 2 | 10.0% |
| All Other Industries | 67 | 13 | 19.4% |
| Real Estate | 23 | 7 | 30.4% |
| Bars and Restaurants | 32 | 11 | 34.4% |
| Hotels and Motels | 28 | 10 | 35.7% |
| Retail Trade | 58 | 24 | 41.4% |
| Seafood Processors and Wholesalers | 24 | 17 | 70.8% |
| | | | |
| All Large CSSP BEL Offers | 471 | 93 | 19.7% |

Sources: CSSP data as of February 11, 2013; SFJ data as of March 16, 2012.
Notes: Based on CSSP BEL offers above $500,000.

**C.   CSSP is attracting many new BEL claims from industries characterized by flawed financial data and from businesses that have not previously claimed to have suffered spill-related harm.**

17.     Trends in the number of new BEL claims submitted to CSSP further suggest that CSSP's use of flawed financial data to determine BEL compensation is attracting both new claimants with flawed financial data as well as claimants that had not previously claimed harm from the DWH spill.  As a starting point, Figure 1 shows that the weekly number of newly submitted BEL claims varies from week to week (due in part to holidays) but follows no discernible trend up or down.

12

**R.E.28**

Figure 1



Note: Based on CSSP weekly data as of February 11, 2013.

18.     However, as shown in Figure 2, this overall trend masks trends among subgroups of claimants that suggest that CSSP's implementation of the BEL framework is attracting an increasing number of claimants from industries such as agriculture, construction, and professional services located in zones C and D with no apparent direct tie to the spill, or even the Gulf Coast. As discussed above (and further below) claimants in these industries often have financial data that fail to properly recognize when revenue is earned and fail to properly align revenue and corresponding variable expenses. Nonetheless, in recent weeks claims from these three industries in zones C and D alone have come to account for more than 25% of all new BEL claims.

13

**Figure 2**



Share of New BEL Claims by Claim Category

Note: Based on CSSP weekly data as of February 4, 2013. Data since February 4, 2013 are excluded as almost 90% of these claims are missing industry information.

19.      In addition, as shown in Figure 3, the share of new claimants that previously claimed

economic loss from the DWH spill by participating in GCCF has fallen steadily in recent months while the

share of new claims accounted for by claimants that did not participate in GCCF has grown.  This in turn

suggests that CSSP is attracting many claimants that did not previously claim to have suffered spill-

related harm.

**R.E.30**

USCA5 24976



**Figure 3**



Note: Based on CSSP weekly data as of February 11, 2013.

20.    In sum, the increasing frequency of these types of claims indicates that CSSP application of data that fails to properly measure variable profit is attracting claimants that did not previously assert, and that were not previously considered to have suffered, spill related losses, and that the impact of these errors on BEL activity is increasing.

## IV.    FAILURE TO PROPERLY MATCH REVENUE AND EXPENSES RESULTS IN SYSTEMATIC OVERCOMPENSATION FOR BEL CLAIMANTS.

21.    CSSP's use of financial data that fail to recognize when revenue was earned and fail to align revenue with expenses incurred leads to errors in measurement of variable profit, which is the cornerstone of the BEL framework.  While Class Counsel does not dispute that errors in the measurement of variable profit lead to anomalous BEL offers, Class Counsel claims (incorrectly) that such errors are occasional and do not systematically benefit claimants.  This section refutes that assertion and briefly explains how the failure to properly match revenue and corresponding expenses

15

**9.   Excerpts of Supplemental Declaration of Hal Sider**

17.     The number of large offers to claimants from industries in Group 1 and Group 2 provides another indication of the frequency with which CSSP relies on flawed and incomplete data resulting in compensation for artificial losses.   As shown in Table 2, 50 of the 100 largest claims are from Group 1 industries while another 38 are from Group 2 industries.  (Group 1 claimants are highlighted in yellow, Group 2 claimants are highlighted in blue.)

**B.     THE CURRENT STATUS OF BEL CLAIMS FILED TO DATE IN INDUSTRIES IN WHICH FLAWED AND INCOMPLETE FINANCIAL DATA ARE PREVALENT**

18.     This section reviews the current status of BEL claims and offers focusing on the industries in which claims are most likely to incorporate flawed and incomplete financial data.  The analysis shows that claims submitted to date in industries in which data problems are prevalent would result in very large potential payments under CSSP's interpretation of the BEL framework.

19.     As shown in Table 3, more than 40,000 BEL claims had been submitted to CSSP as of March 3, 2013, and additional claims continue to be submitted.[8]  As of March 3, CSSP has extended offers to 4,948 BEL claims, which reflects 12% of all BEL claims submitted.  Another 9% of BEL claims have been denied.  Thus, 79% of BEL claims submitted to CSSP remain outstanding, having neither been denied nor offered compensation.  Outstanding claims include (i) those that are "under review" by CSSP and (ii) those that have been issued an "incomplete notice."   Claimants with incomplete status are entitled to supplement their submission, subject to certain deadlines.

20.     Tables 3 and 4 report BEL offers by major industry.  Through March 3, 2013, nearly 5,000 offers have been made with a total value (including RTP) of $1.16 billion.  Construction claimants have received $210 million in BEL offers for 596 claims through March 3, 2013 (18% of total value of offers made).  Group 1 claimants (construction, professional services and agriculture) have received 1,245 BEL offers that total $418 million (36% of the total value).  Group 2 claimants (real estate,

---

[8] The count of BEL claims includes claims for failed businesses and start-up businesses.

**R.E.32**

wholesale, manufacturing, retail) have received 1,743 BEL offers that total $369 million (32% of the total

value of offers made).

21.     As Tables 3 and 4 indicate, roughly 80% of claims in Groups 1 and 2 are outstanding, not

yet receiving either an offer or a denial notice.  This includes more than 7,600 outstanding Group 1

claims and more than 11,000 outstanding Group 2 claims.  At present it is not known (i) how many

outstanding claims ultimately will receive offers and (ii) what the future value of offers will be.  As a

result, it is not possible to reliably estimate the value of offers for outstanding BEL claims.  However,

extrapolation based on current BEL offers (which reflect CSSP's January 15, 2013 Policy Decision

regarding the BEL framework) and claims made to date could result in billions of dollars in offers in the

industries in which CSSP most frequently relies on flawed and incomplete data.

**C.     CSSP'S RELIANCE ON FLAWED AND INCOMPLETE FINANCIAL DATA IS ATTRACTING NEW
        CLAIMS FROM INDUSTRIES AND AREAS REMOTE FROM THE SPILL.**

22.     New BEL claims continue to be filed each week and new claims can be filed through

April 22, 2014 or six month after the "Effective Date" of the Settlement Agreement.[9]  As discussed in my

February 18, 2013 declaration, CSSP's implementation of the BEL framework using flawed and

incomplete data that results in BEL offers that compensate claimants for artificial losses is attracting

claims from many businesses that had not previous claimed harm from the DWH spill, and from areas

that are remote from the DWH spill.

23.     This section shows that CSSP's reliance on flawed and incomplete financial data is

having a dramatic "feedback" effect that is attracting an increasing number of claimants that have not

previously claimed spill related harm, and from areas (economic loss zones C and D) that are remote

---

[9] Settlement Agreement Paragraph 5.11.8 says:  For all Claims other than those made under the Seafood
Compensation Program, the deadline for submission of Claim Forms to the Settlement Program shall be April 22,
2014 or 6 (six) months after the Effective Date, whichever occurs later, and the Settlement Program shall remain
open through the determination, appeals, and where applicable, payment of all timely submitted Claim Forms.

USCA5 25049

**R.E.33**

Table 1

**Percent of Offers that Meet an Indicator of Flawed and Incomplete Data and
Percent of Claims with Disproportionately Large Offer**

| Industry | Offers | Percent that Meet an Indicator of Flawed and Incomplete Data | Percent with Disproportionately Large Offer |
|---|---|---|---|
| Agriculture | 70 | 99% | 77% |
| Professional Services | 274 | 85% | 39% |
| Construction | 325 | 84% | 54% |
| Real Estate | 276 | 82% | 39% |
| Wholesale Trade | 86 | 70% | 47% |
| Manufacturing | 117 | 64% | 38% |
| Retail Trade | 304 | 61% | 32% |
| Health Care | 155 | 55% | 17% |
| Hotels and Motels | 117 | 51% | 10% |
| Bars and Restaurants | 233 | 22% | 15% |
| All Other Industries | 357 | 71% | 32% |
| Total | 2,314 | 68% | 35% |

Source: Data from CSSP workbooks for BEL claims with final offers exceeding $75,000 as of March 4, 2013 made available to the parties under the provisions of the Settlement Agreement.

Notes: Claims that Meet an Indicator of Flawed and Incomplete Data are those which meet at least one of the three indicators using 2009 data.

Disproportionately large offers are defined as those in which claimant's 2010 variable profit implied by the BEL offer exceeds its variable profit in the benchmark period by more than 25%. A claimant's 2010 variable profit implied by the BEL offer is defined as the sum of (i) actual 2010 variable profit and (ii) BEL base compensation offer (which excludes RTP). Disproportionately large offers are identified by comparing implied 2010 variable profit and benchmark variable profit based on either an annual or May-December basis.

**R.E.34**

USCA5 25053

**10. Excerpts of Declaration of Roman L. Weil**

# APPENDIX D

## ROMAN L. WEIL – GLOSSARY OF ACCOUNTING TERMS USED IN THE BEL FRAMEWORK

The following are **terms** and their definitions taken from the cited textbooks and professional reference books.

## Profit

"Present practice accepts a variety of terms for net income, *profit*, net loss, and other equivalent terms will continue to be used in financial statements as names for earnings."

Financial Accounting Standards Board Concept Statement No. 5 (As Amended): Recognition and Measurement in Financial Statements of Business Enterprises, 1984, p. 12 (italics added).

"**profit.** Excess of *revenues* over *expenses* for a *transaction*; sometimes used synonymously with *net income* for the period."

R.L. Weil and M.W. Maher, *Handbook of Cost Management*, (2nd edition), John Wiley & Sons, 2005, p. 112 (emphasis in original).

"**profit** Excess of *revenues* over *expenses* for a *transaction*; sometimes used synonymously with *net income* for the *period*, especially under *IFRS*."

Maher, M.W., C.P. Stickney, and R.L. Weil, *Managerial Accounting: An Introduction to Concepts, Methods and Uses*, (11th edition), South-Western, Cengage Learning, 2012, p. 579 (emphasis in original).

"**profit** Excess of *revenues* over *expenses* for a *transaction*; sometimes used synonymously with *net income* for the *period*, especially under *IFRS*. 'Profit' is a *credit* balance. Many writers and top accountants misleadingly use terminology such as 'distribute profits." This usage confuses because the firm paying a *dividend* distributes *cash* or other assets, with a credit to the *retained earnings* (retained profits) account. Careful users do not say 'distribute profits,' but even top standard setters sometimes do: '. . . no accounting standard can or should seek to define what element of profits can be distributed.' The lay reader will think that the company distributes some amorphous thing called 'profits,' rather than think the company distributes cash or other assets generated by activities that result in reported profits."

1

**R.E.35**

## APPENDIX D
### ROMAN L. WEIL - GLOSSARY OF ACCOUNTING TERMS USED IN THE BEL FRAMEWORK

Weil, R.L., K. Schipper and J. Francis, *Financial Accounting: An Introduction to Concepts, Methods, and Uses* (14th Edition), South-Western, Cengage Learning, 2014, pp. 805-806 (emphasis in original).

## Revenue

"Revenues are inflows or other enhancements of assets of an entity or settlements of its liabilities (or a combination of both) from delivering or producing goods, rendering services, or other activities that constitute the entity's ongoing major or central operations."

Financial Accounting Standards Board Concept Statement 6 (As Amended): Elements of Financial Statements, 1985, p. 30, Par. 78.

"Revenues represent actual or expected cash inflows (or the equivalent) that have occurred or will eventuate as a result of the entity's ongoing major or central operations."

Financial Accounting Standards Board Concept Statement No. 6 (As Amended): Elements of Financial Statements, 1985, p. 30, Par. 79.

"Revenues measure the inflows of net assets from selling goods and providing services (that is, assets less liabilities)."

Stickney, C.P. and P.R. Brown, *Financial Reporting and Statement Analysis: A Strategic Perspective*, (4th edition), The Dryden Press, 1999, p. 22.

"**Revenues** Increases in assets or settlements of liabilities from ongoing operations."

Libby, R., P. Libby and D.G. Short, *Financial Accounting*, (7th edition), McGraw-Hill/Irwin, 2011, p. G-4 (emphasis in original).

"**REVENUES.** Inflows or other enhancements of assets of an entity or settlements of its liabilities (or a combination of both) during a period from delivering or producing goods, rendering services, or other activities that constitute the entity's ongoing major or central operations."

Kieso, D., J. Weygandt and T. Warfield, *Intermediate Accounting*, (14th edition), John Wiley & Sons, 2012, p. 55 (emphasis in original).

2

USCA5 25146

## APPENDIX D
### ROMAN L. WEIL - GLOSSARY OF ACCOUNTING TERMS USED IN THE BEL FRAMEWORK

"**revenue** The *owners' equity* increase accompanying the *net assets* increase caused by selling *goods* or rendering *services*; in short, a service rendered; *sales* of *products*, *merchandise*, and *services* and *earnings* from *interest*, *dividends*, *rents*, and the like. Conceptually (in contrast to specific guidance in *accounting standards*) measure *revenue* as the expected *net present value* of the net assets the firm will receive. **Do not confuse with *receipt* of *funds*, which may occur before, when, or after revenue is recognized.** Contrast with *gain* and *income*. See also *holding gain*. Some writers use the term 'gross income' synonymously with *revenue*; avoid such usage."

Weil, R.L., K. Schipper and J. Francis, *Financial Accounting: An Introduction to Concepts, Methods, and Uses* (14th Edition), South-Western, Cengage Learning, 2014, p. 814 (italics in original; bold added).

"**revenue** The *owners' equity* increase accompanying the *net assets* increase caused by selling *goods* or rendering *services*; in short, a service rendered; *sales* of *products*, *merchandise*, and *services* and *earnings* from *interest*, *dividends*, *rents*, and the like. Conceptually (in contrast to specific guidance in *accounting standards*) measure *revenue* as the expected *net present value* of the net assets the firm will receive. **Do not confuse with *receipt* of *funds*, which may occur before, when, or after revenue is recognized.** Contrast with *gain* and *income*. See also *holding gain*. Some writers use the term 'gross income' synonymously with *revenue*; avoid such usage."

Maher, M.W., C.P. Stickney, and R.L. Weil, *Managerial Accounting: An Introduction to Concepts, Methods and Uses*, (11th edition), South-Western, Cengage Learning, 2012, p. 588 (italics in original; bold added).

"**revenue** The *owners' equity* increase accompanying the *net assets* increase caused by selling *goods* or rendering *services*; in short, a service rendered; *sales* of *products*, *merchandise*, and *services* and *earnings* from *interest*, *dividends*, *rents*, and the like. Conceptually (in contrast to specific guidance in *accounting standards*) measure *revenue* as the expected *net present value* of the net assets the firm will receive. **Do not confuse with *receipt* of *funds*, which may occur before, when, or after revenue is recognized.** Contrast with *gain* and *income*. See also *holding gain*. Some writers use the term 'gross income' synonymously with *revenue*; avoid such usage."

R.L. Weil and M.W. Maher, *Handbook of Cost Management*, (2nd edition), John Wiley & Sons, 2005, p. 126 (italics in original; bold added).

3

# APPENDIX D
### ROMAN L. WEIL - GLOSSARY OF ACCOUNTING TERMS USED IN THE BEL FRAMEWORK

## Expense

"Expenses are outflows or other using up of assets or incurrences of liabilities (or a combination of both) from delivering or producing goods, rendering services, or carrying out other activities that constitute the entity's ongoing major or central operations."

Financial Accounting Standards Board Concept Statement 6 (As Amended):
   Elements of Financial Statements, 1985, p. 31, Par. 80.

"Expenses represent actual or expected cash outflows (or the equivalent) that have occurred or will eventuate as a result of the entity's ongoing major or central operations."

Financial Accounting Standards Board Concept Statement 6 (As Amended):
   Elements of Financial Statements, 1985, p. 31, Par. 81.

"Expenses measure the outflows of net assets that a firm uses, or consumes, in the process of generating revenues."

Stickney, C.P. and P. Brown, *Financial Reporting and Statement Analysis: A Strategic Perspective*, (4th edition), The Dryden Press, 1999, p. 22.

"**Expenses** Decreases in assets or increases in liabilities from ongoing operations incurred to generate revenues during the period."

Libby, R., P. Libby and D.G. Short, *Financial Accounting*, (7th edition), McGraw-Hill/Irwin, 2011, p. G-2 (emphasis in original).

"**Expenses** outflows or other using up of assets or incurrences of liabilities during a period from delivering or producing good, rendering services, or other activities that constitute the entity's ongoing major, or central, operations."

Nelson, M.W., J.F. Sepe and J.D. Spiceland, *Intermediate Accounting*, (7th Edition), McGraw-Hill/Irwin, 2013, p. G-2 (emphasis in original).

"**EXPENSES.** Outflows or other using-up of assets or incurrences of liabilities (or a combination of both) during a period from delivering or producing goods,

USCA5 25148

**R.E.38**

## APPENDIX D
### Roman L. Weil - Glossary of Accounting Terms Used in the BEL Framework

rendering services, or carrying out other activities that constitute the entity's ongoing major or central operations."

Kieso, D., J. Weygandt and T. Warfield *Intermediate Accounting*, (14th edition), John Wiley & Sons, 2012, p. 55 (emphasis in original).

"**expense**  As a noun, a decrease in *owners' equity* accompanying the decrease in *net assets* caused by selling *goods* or rendering *services* or by the passage of time; a "gone" (net) asset; an *expired cost*. Measure *expense* as the cost of the (net) assets used.  **Do not confuse with *expenditure* or *disbursement*, which may occur before, when, or after the *firm recognizes* the related expense.**  Use the word 'cost' to refer to an item that still has *service potential* and is an asset. Exceptions sometimes occur, as in *Cost of Goods Sold*.  Use the word 'expense' after the firm has used the asset's service potential.  As a verb, 'expense' means to designate as expenditure -- past, current, or future -- as a current expense."

Weil, R.L., K. Schipper and J. Francis, *Financial Accounting: An Introduction to Concepts, Methods, and Uses* (14th Edition), South-Western, Cengage Learning, 2014, p. 772 (italics in original; bold added).

"**expense**  As a noun, a decrease in *owners' equity* accompanying the decrease in *net assets* caused by selling *goods* or rendering *services* or by the passage of time; a "gone" (net) asset; an *expired cost*. Measure *expense* as the cost of the (net) assets used.  **Do not confuse with *expenditure* or *disbursement*, which may occur before, when, or after the *firm recognizes* the related expense.**  Use the word 'cost' to refer to an item that still has *service potential* and is an asset. Exceptions sometimes occur, as in *Cost of Goods Sold*.  Use the word 'expense' after the firm has used the asset's service potential.  As a verb, 'expense' means to designate as expenditure -- past, current, or future -- as a current expense."

Maher, M.W., C.P. Stickney, and R.L. Weil, *Managerial Accounting: An Introduction to Concepts, Methods and Uses*, (11th edition), South-Western, Cengage Learning, 2012, p. 542 (italics in original; bold added).

"**expense**  As a noun, a decrease in *owners' equity* accompanying the decrease in *net assets* caused by selling *goods* or rendering *services* or by the passage of time; a "gone" (net) asset; an *expired cost*. Measure *expense* as the cost of the (net) assets used.  **Do not confuse with *expenditure* or *disbursement*, which may occur before, when, or after the *firm recognizes* the related expense.**  Use the word 'cost' to refer to an item that still has *service potential* and is an asset. Exceptions sometimes occur, as in *Cost of Goods Sold*.  Use the word 'expense'

5

**R.E.39**

### APPENDIX D
ROMAN L. WEIL - GLOSSARY OF ACCOUNTING TERMS USED IN THE BEL FRAMEWORK

after the firm has used the asset's service potential. As a verb, 'expense' means to designate as expenditure -- past, current, or future -- as a current expense."

R.L. Weil and M.W. Maher, *Handbook of Cost Management*, (2nd edition), John Wiley & Sons, 2005, p. 60 (italics in original; bold added).

**Corresponding (not a technical term in accounting, but has the same meaning as the technical term *matching*)**

"**Matching Principle**  Requires that expenses be recorded when incurred in earning revenue."

Libby, R., P. Libby and D.G. Short, *Financial Accounting*, (7th edition), McGraw-Hill/Irwin, 2011, p. G-3 (emphasis in original).

"**matching convention**  The concept of recognizing *cost* expirations (*expenses*) in the same *accounting period* during which the firm recognizes related *revenues*; combining or simultaneously recognizing the revenues and expenses that jointly result from the same *transactions* or other events."

Weil, R.L., K. Schipper and J. Francis, *Financial Accounting: An Introduction to Concepts, Methods, and Uses* (14th Edition), South-Western, Cengage Learning, 2014, p. 793 (emphasis in original).

"**matching convention**  The concept of recognizing *cost* expirations (*expenses*) in the same *accounting period* during which the firm recognizes related *revenues*; combining or simultaneously recognizing the revenues and expenses that jointly result from the same *transactions* or other events."

Maher, M.W., C.P. Stickney, and R.L. Weil, *Managerial Accounting: An Introduction to Concepts, Methods and Uses*, (11th edition), South-Western, Cengage Learning, 2012, p. 564 (emphasis in original).

"**matching convention**  The concept of recognizing *cost* expirations (*expenses*) in the same *accounting period* during which the firm recognizes related *revenues*; combining or simultaneously recognizing the revenues and expenses that jointly result from the same *transactions* or other events."

R.L. Weil and M.W. Maher, *Handbook of Cost Management*, (2nd edition), John Wiley & Sons, 2005, p. 92 (emphasis in original).

**R.E.40**

USCA5 25150

# CERTIFICATE OF SERVICE

I hereby certify that on August 30, 2013, an electronic copy of the foregoing Record Excerpts for Appellees BP Exploration & Production, Inc., BP America Production Company, and BP p.l.c. was filed with the Clerk of Court for the United States Court of Appeals for the Fifth Circuit using the appellate CM/ECF system, and that service will be accomplished by the appellate CM/ECF system.

   /s/ Theodore B. Olson
Theodore B. Olson
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500

## CERTIFICATE OF ELECTRONIC COMPLIANCE

I hereby certify that on August 30, 2013, these Record Excerpts for Appellees was transmitted to the Clerk of the United States Court of Appeals for the Fifth Circuit through the Court's CM/ECF document filing system, https://ecf.ca5.uscourts.gov.   I further certify that: (1) required privacy redactions have been made pursuant to this Court's Rule 25.2.13, (2) the electronic submission is an exact copy of the paper document pursuant to this Court's Rule 25.2.1, and (3) the document has been scanned with the most recent version of Microsoft Forefront Endpoint Protection and is free of viruses.

   /s/ Theodore B. Olson
Theodore B. Olson
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500